GAMBLE CONSTRUCTION CO., INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent INVESTMENT HOLDINGS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Gamble Constr. Co. v. Commissioner
Docket Nos. 2022-74, 2023-74.
United States Tax Court
T.C. Memo 1978-404; 1978 Tax Ct. Memo LEXIS 111; 37 T.C.M. (CCH) 1675; T.C.M. (RIA) 78404; October 10, 1978, Filed *111 (1) On Aug. 14, 1968, X entered into a purchase agreement with the shareholders of Y pursuant to which X purchased 90 percent of Y's stock. Subsequently, Y transferred funds to X, which X used to pay the former shareholders of Y under the purchase agreement. Held, under the facts of this case, the transfers were bona fide loans and not dividends, and therefore X was not subject to the personal holding company tax. (2) X and Y entered into a management contract in which X agreed to provide management services for Y in exchange for 50 percent of Y's pre-tax profits. In 1970, an officer of X was paid a salary by Y for performing services required under the management contract. Held, under the facts of this case, the management fees were intended to be compensation purely for services, and such fees were reasonable in view of the services performed. Held, further, the salary paid the officer of X did not represent reasonable compensation for services actually rendered. (3) Held, X did not prove that it was entitled to an interest deduction of $ 3,885.07. (4) On Aug. 14, 1968, Y became eligible to file a consolidated return with X. Y's 1968 tax return, absent *112 a valid extension, was due March 15, 1969, and X's tax return normally was due on April 15, 1969. X applied for and received extensions to Oct. 15, 1969, and it indicated in such applications that it would file a consolidated return and that Y was a member of the group. X and Y decided not to file a consolidated return, and Y filed its separate return for 1968 on Jan. 19, 1970. Held, the 25-percent late filing addition was properly imposed as to the deficiency attributable to the period Jan. 1, 1968 to Aug. 14, 1968. Held, further, the maximum addition for the deficiency attributable to the balance of the year is 15 percent. Lawrence Brody,Dave L. Cornfeld,Carroll J.
Donahue, and Bruce Springer, for the petitioners.David J. Duez, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined deficiencies and additions to tax in the petitioners' Federal corporate income taxes, and Gamble Construction Co., Inc., claimed overpayments, in the following amounts: Addition
Year
Sec. 6651(a) Petitioner
Ended
Deficiency
I.R.C. 1954 [1]
Overpayment
Gamble Construction
12/31/67 $ 4,067.86
$ 7,586.37
Co., Inc.
12/31/68
63,191.90 $ 8,497.74
10,804,39
12/31/69
50,745.10
218.98
12/31/70
118,099.02
Investment Hold-
1/31/69
494,052.86
123,513.22
ings, Inc.
1/31/70
121,453.59
1/31/71
55,898.73
The parties have settled certain issues. The issues remaining for decision are: (1) Whether certain transfers of funds between the petitioners constituted bona fide loans or dividends; (2) whether payments between the petitioners pursuant *115 to a management contract, and whether a payment of $ 28,483.30 to an officer of one of the petitioners, were intended as compensation for services and constituted reasonable compensation for services actually rendered; (3) whether one of the petitioners is entitled to an interest deduction of $ 3,885.07; and (4) whether the petitioners are liable for late filing additions under section 6651(a). FINDINGS OF FACT General
Some of the facts have been stipulated, and those facts are so found. The petitioner, Gamble Construction Co., Inc. (Gamble), is a Missouri corporation which had its principal office in St. Louis, Mo., at the time it filed its petition in this case. Gamble timely filed its Federal corporate income tax return for the calendar year 1967 with the District Director of Internal Revenue, St. Louis, Mo. Gamble filed its Federal corporate income tax return for 1968 on January 14, 1970, with the Internal Revenue Service Center, Kansas City, Mo. Gamble timely filed such returns for 1969 and 1970 with the Internal Revenue Service Center, Kansas City, Mo. Gamble kept its books and records and reported its income for the years in issue using the completed contract *116 method of accounting. The petitioner, Investment Holdings, Inc. (Investment), is a Missouri corporation which had its principal offices in Maryland Heights, No., at the time it filed its petition in this case. It filed its Federal corporate income tax returns on the basis of a taxable year ending January 31, and we shall identify each taxable year by the calendar year in which it ended. Investment filed its Federal corporate tax return for 1969 with the Internal Revenue Service Center, Kansas City, Mo., on June 9, 1970. Investment timely filed such returns for its taxable years 1970 and 1971 with the Internal Revenue Service Center, Kansas City, Mo. Gamble
Prior to 1956, Gamble was incorporated. In 1956, several long-time employees of Gamble acquired all of its issued and outstanding stock from its previous shareholders. Subsequently, two other persons became shareholders. From 1956 through 1965, four of these shareholders were directors, officers, and full-time key employees of Gamble. However, within a period of several months during 1965, two of them resigned. In connection with their resignations, Gamble agreed to redeem their stock over the next several years. *117 Following such resignations, Pringle T. George, the president and principal shareholder of Gamble, reported to its board of directors that he was apprehensive about the disruptive effect such resignations might have on Gamble's various construction projects and that he anticipated "serious additional losses" to occur in the short run. He informed the board that Gamble's commitment to repurchase their stock would drain Gamble's capital surplus to such an extent that Gamble would have to re-evaluate its policy of periodically replacing old equipment and purchasing new equipment and that its growth potential might be seriously impeded. In addition, Mr. George questioned whether Gamble would be able to find adequate replacements for the retiring employees. On August 13, 1968, Gamble had 2,000 shares of stock outstanding. Mr. George held 1,500 of such shares, Sherwood R. Hughes held 300, and L. A. Bannes held 200. Mr. Bannes' stock was subject to a repurchase agreement pursuant to which such stock was redeemed by Gamble prior to August 31, 1975.
Investment
Investment was originally organized as Friedman Textile Co. in 1946 by Harvey A. Friedman and his father. It acquired *118 its present corporate name prior to December 31, 1968, and we will refer to it for all periods as Investment. In the late 1950's, Burnett Schwartz, an attorney who had represented both Investment and the Friedman family, acquired stock in Investment. By August 14, 1968, and during all of the years in issue, Mr. Friedman, Mr. Schwartz, and their families owned all of Investment's issued and outstanding stock. Originally, Investment was primarily engaged as a wholesaler in the domestic textile business. By the early 1960's, Investment had expanded its operation to include the wholesale, retail, and leased department store domestic textile business on a national basis. However, these activities were largely terminated by the beginning of 1967. Thereafter, Investment's major asset was its ownership of 31,102 shares of stock of International Super Stores (ISS), which represented approximately 10 percent of ISS's outstanding stock. Approximately 30 percent of such stock was publicly owned, and the remaining 60 percent was held by Mr. Friedman, Mr. Schwartz, and their families. ISS was originally organized by Mr. Friedman in 1960 as Linco. Initially, it was involved in the linen *119 leased department store business but gradually expanded its operation to include hard goods such as toys, housewares, and major appliances. By 1966, ISS owned and operated eight discount department stores. At its peak, ISS had gross annual revenue of approximately $ 60 million, and it employed more than 500 persons. During 1967, ISS sold all of its discount stores. However, it retained leases on four of the stores with terms ranging from 20 to 25 years. These stores were subsequently subleased by ISS at an aggregate yearly rental of approximately $ 100,000. By August 14, 1968, ISS also owned 91 percent of the outstanding stock of Bernard Nursing Home, Inc. (Bernard), a company engaged in the nursing home business in St. Louis. In 1969, ISS sought to have Bernard's stock publicly marketed. To facilitate a public offering, Bernard was merged into a newly formed subsidiary of ISS, Medigroup, Inc. (Medigroup), on August 14, 1969. A preliminary prospectus was prepared in which it was contemplated that 210,000 shares of Medigroup stock, representing approximately 40 percent of the total outstanding shares of the corporation, would be sold to the general public for approximately *120 $ 3.15 million. Of the total shares sold, ISS expected to sell 90,000 shares for its own account and to receive approximately $ 1.35 million, of which approximately $ 240,000 was to be used to retire indebtedness from ISS to Medigroup. The public offering was never consummated. Subsequently, ISS engaged in extensive negotiations during 1969 and 1970 to effect a private sale of Medigroup to two different corporations. With the one corporation, a draft letter of understanding was executed under which the prospective purchaser agreed to acquire substantially all of the assets of Medigroup, subject to substantially all of Medigroup's liabilities, in exchange for its subordinated notes in the face amount of $ 3 million, 5-year warrants to purchase 100,000 shares of its common stock at $ 12 per share, and additional shares of common stock based upon the earnings of Medigroup over a 5-year period. With the other corporation, the tentative agreement called for the prospective purchaser to purchase all of the outstanding shares of Medigroup stock for $ 912,000 in cash, subject to adjustments based on the after-tax earnings of Medigroup. In addition, the purchaser's subsidiary also agreed *121 to pay additional consideration, either in cash or stock, equal to the amount by which the after-tax earnings of Medigroup for its first 5 taxable years after the purchase exceeded $ 760,000. Neither prospective sale was completed. Mr. Friedman and Mr. Schwartz
Harvey A. Friedman was born, reared, educated, and has resided all of his life in St. Louis, Mo. After graduating from a local high school, he attended Washington University Business School in St. Louis from 1938 through 1941. In later years, he took postgraduate courses at Washington University, Standord University, and the University of Massachusetts. Mr. Friedman enlisted in the Air Corps in 1942 where he served as an administrative inspector. His duties included inspecting books and records and other business matters at various air force bases. He was discharged from the service in 1946, at which time he and his father organized Investment. Mr. Friedman became president and chief operating officer of Investment in 1949. He also has been the chief executive officer of ISS since its organization in 1960. In 1965, Mr. Friedman helped organize a real estate firm, which was responsible for the construction *122 of several discount stores. Mr. Friedman was involved in the construction process by participating in the site selection and the exterior and interior design of the stores, by working with architects on the detailed plans and specifications, and by awarding contracts to the general contractor. Prior to and during the years in issue, Mr. Friedman was a member of many business, civic, charitable, and religious groups and organizations, including the Masons, the Scottish Rite, the Shrine, the Missouri Botanical Garden, the Art Museum, the St. Louis Zoo, Temple Israel, the Regional Chamber of Commerce, the Wellston Chamber of Commerce, American Jewish Committee, B'nai Brith, Missouri Health Care Association, Illinoi Health Care Association, American Health Care Association, White House Conference on Aging, Missouri Historical Society, and the Young Presidents Organization. Burnett Schwartz was also born, reared, and educated in St. Louis, Mo. He attended local grade and high schools and received his undergraduate and law degrees from Washington University. In 1949, he joined his father's law practice. In the late 1950's, Mr. Schwartz acquired stock in Investment, and by 1967, *123 he had substantially ceased his practice of law to devote most of his time to Investment. During the years in issue, Mr. Schwartz was a member of the Missouri and St. Louis bar associations. He was also active in religious, political, civic, and cultural groups. 1. Loan - Dividend
On August 14, 1968, Investment purchased 1,800 shares of Gamble's stock from Mr. George and Mr. Hughes pursuant to a letter agreement entered into on August 10, 1968 (1968 agreement). Such stock represented 90 percent of Gamble's outstanding stock, and Investment agreed to pay a total purchase price of $ 1,454,920.22. Under the 1968 agreement, Investment agreed to pay $ 430,000.00 at the closing, $ 102,000.00 on February 1, 1969, $ 150,000.00 on October 15, 1969, $ 200,000.00 payable in quarterly installments of $ 10,000.00 commencing March 15, 1969, and $ 572,920.22 payable in the from of 50 percent of Gamble's net profits before Federal income taxes in the years 1969 through 1973. Any liability outstanding at the end of 1973 was to be paid in one lump sum. On August 14, 1968, subsequent to the stock purchase, Gamble transferred $ 500,000 in cash to Investment. Of such amount, $ 430,000 *124 was used by Investment to pay its initial obligation under the 1968 agreement. In addition, Gamble transferred to Investment an additional $ 147,191 between August 15, 1968 and January 31, 1969, $ 209,755 between February 1, 1969 and January 31, 1970, and $ 154,409 between February 1, 1970 and January 31, 1971. Most of such funds were used by Investment to pay its obligations under the 1968 agreement. On their books and records, Gamble recorded such transfers as "notes receivable," and Investment recorded them as "loans payable." On August 28, 1968, the petitioners agreed that Investment would provide management services to Gamble for an annual consideration equal to 50 percent of Gamble's pre-tax net profits. At the end of calendar years 1968, 1969, and 1970, the petitioners calculated the amount of management fees owing from Gamble to Investment and then decreased their notes receivable and loans payable accounts by such amounts. In addition, in its 1970 and 1971 taxable years, Investment transferred $ 1,500.00 and $ 25,000.00 in cash to Gamble, and both petitioners reduced their notes receivable and loans payable accounts by such amounts. The yearly advances from Gamble *125 to Investment, reduced by the management fees and cash payments, were evidenced by negotiable, noninterest-bearing, unsecured, demand promissory notes executed by Investment at the end of 1968, 1969, and 1970 in the respective amounts of $ 587,256.71, $ 161,778.92, and $ 32,607.00. Raymond J. Gabel, who began working for The Travelers Indemnity Company (Travelers) in 1952, was the head of the surety section of Travelers' St. Louis office from 1957 through 1976. He participated in all its bonding decisions with respect to construction projects in the St. Louis area from 1957 to 1976. With the exception of pre-1969 projects which involved less than $ 1 million, Mr. Gabel handled all of Gamble's bonding requirements. Shortly after the consummation of the 1968 agreement, Mr. Gable became aware of it, though he was not informed of all the details. While inspecting Gamble's financial statements and records in connection with requests for bonding by Travelers, at some time not earlier than the spring of 1969, Mr. Gabel became aware of the 1968 cash transfer from Gamble to Investment. Mr. Gabel asked Mr. Schwartz for the details of the stock purchase agreement, and Mr. Schwartz told *126 him that the advances to Investment were loans which would be used to pay Mr. George and Mr. Hughes under the 1968 agreement. Mr. Gabel was also informed of the management services contract and that the fees thereunder would be used to offset the loans. Initially, Mr. Gabel was concerned whether the advances would be repaid and, as a consequence, whether the notes receivable account of Gamble should be considered an asset for bonding purposes. However, based on his discussions and negotiations with Mr. Schwartz, Mr. Gabel was convinced that advances from Gamble to Investment were loans, that Gamble intended to collect them, and that Investment intended to repay them by cash advances and credits for management fees. He felt that, because of the 1968 agreement, no significant reduction in indebtedness could be accomplished until Mr. George and Mr. Hughes were paid, which he thought would require a minimum of 3 to 5 years. Nevertheless, Travelers and Mr. Gabel were willing to provide bonding for Gamble jobs during 1969 because they were confident the advances would be repaid in time. After 1969, Gamble sought to handle a higher volume of business, and Mr. Schwartz negotiated *127 with Mr. Gabel to have Travelers increase the bonding for Gamble. Gamble's volume of completed bonded jobs increased from $ 5,625,000 in 1968 to $ 13,489,000 for the year ended January 31, 1972. However, as a condition of the increased bonding after 1969, Investment, Mr. Schwartz, and Mr. Friedman agreed to indemnify Travelers for all post-1969 bonds. During the course of their negotiations, Mr. Schwartz raised the possibility of eliminating the indebtedness by having Gamble declare a dividend, but Mr. Gabel rejected the idea out of hand. After 1969, Mr. Gabel continued to urge Mr. Schwartz and Mr. Friedman to repay the advances as quickly as possible. He was concerned about the amount of Gamble's earnings which were committed to the payment of Investment's obligations under the 1968 agreement, and he encouraged Mr. Schwartz and Mr. Friedman to renegotiate that agreement. At Mr. Gabel's urging, Investment, Mr. George, and Mr. Hughes entered into a revised agreement, at the beginning of 1971, which extended the payment period to 1977 and provided for payment of the obligation in 12 semi-annual installments over such period. In connection with a large construction job, Gamble *128 ran into financial difficulty in 1975. Gamble was unable to meet its expenses, and Investment, Mr. Schwartz, and Mr. Friedman hypothecated all of their ISS stock to induce Travelers to advance $ 1 million to cover such expenses. Investment and Gamble represented in all of the financial statements which were submitted to banks and insurance companies for purposes of acquiring loans during the years in issue that the advances were loans. Mr. Friedman also considered selling Gamble and using the proceeds from such sale to repay the loans. On its tax returns for each of the years in issue, Investment treated the advances as loans. In his notice of deficiency, the Commissioner determined that such advances were dividends, and that as a result, Investment was a personal holding company subject to the 70-percent tax imposed on undistributed personal holding company income.
2. Reasonable Compensation
The management contract between Investment and Gamble, which they approved by resolutions, provided that the services would be performed by Mr. Friedman and Mr. Schwartz. Under such contract, it was contemplated that Investment would assist Gamble to obtain negotiated contracts, *129 assist Gamble to get on additional bidding lists, provide personnel methods and plans to improve employee morale, obtain additional managerial personnel, take steps to insure the continued employment of key Gamble personnel, improve and expedite buying procedures, and provide programs to publicize Gamble and generally promote its business.
Pursuant to the management contract, Mr. Friedman and Mr. Schwartz conducted a thorough examination of Gamble's operations. Such examination included a detailed inspection of Gamble's real estate and equipment, interviewing key employees and reviewing their service records and salaries, studying Gamble's method of handling payroll, receivables, and job progress reports, and reviewing Gamble's procedure in obtaining contracts and making purchases. The study led Mr. Friedman and Mr. Schwartz to the following conclusions: (1) Employee morale was low primarily because key personnel were unhappy about their salaries, the inadequate equipment, the absence of amenities, and the lack of communication between them and Gamble; (2) there was a shortage of necessary equipment and much of the existing equipment was in bad repair and outdated; (3) there were *130 shortages of personnel in key positions, particularly estimating and architectural; (4) there was a complete absence of promotional, advertising, and public relations activities by or on behalf of Gamble; (5) the accounting system was outdated and inefficient; (6) Gamble paid too much for materials because it did not purchase them competitively; (7) Gamble should emphasize negotiated contracts, rather than competitively bid contracts; and (8) since many regular builders in the St. Louis area only permitted a few select general contractors to submit bids on projects, Gamble should endeavor to get on these select "bid lists." Mr. Friedman and Mr. Schwartz took quick and decisive action to implement the changes called for by their study. They instituted a program to improve employee morale: Communication with key employees and job superintendents was established by holding regular monthly meetings with them and discussing whatever problems they had encountered during the previous month. Job descriptions were provided, and a 2-year betterment program for the company was prepared through meetings with and the cooperation of key employees. At the completion of a job, the job superintendents *131 were informed whether the job was profitable, and if so, they were duly commended. Key employees were promoted, and pay increases were forthcoming. In addition, Mr. Friedman and Mr. Schwartz provided many amenities for job superintendents and key employees. Some of them were furnished with company cars, and in June 1969, a pension plan was instituted for their benefit. An annual dinner was held regularly for key personnel, job superintendents, foremen, and other employees who had distinguished themselves during the year. Their spouses were invited, and service pins, awards, and prizes were distributed. Immediately after the acquisition, Mr. Friedman and Mr. Schwartz had all of Gamble's equipment (much of which was rusted and in poor condition) cleaned, oiled, painted, and put in working conditio5. In addition, at their direction, Gamble purchased small tools, a truck, a wagon, a man hoist, several cranes, small tractors with backhoes, and a truck and trailer to remove trash from construction sites. Gamble's new equipment purchases in 1967 were $ 45,080 and, from January 1, 1968 through August 14, 1968, were $ 9,964. From August 14, 1968 through December 31, 1968, new equipment *132 purchases totaled $ 104,559. Through 1969, Mr. George remained president of Gamble. Thereafter, L. T. Bannes became president of Gamble and served in that capacity throughout the years in issue. Prior to 1970, Gamble did not employ a full-time estimator, the person who prepares detailed cost analyses of projected work to enable a contractor to submit bids on construction contracts. Mr. Friedman and Mr. Schwartz hired Donald Voss to fill such position on February 25, 1970. In addition, they hired an architect on December 1, 1969. Both of these employees eventually became officers of Gamble. Mr. Friedman and Mr. Schwartz also instituted an advertising and public relations campaign. All equipment was visibly lettered with Gamble's name. Signs identifying Gamble as the general contractor were placed on all jobs. Trailers used as on-the-job offices and trailers used to haul materials were visibly lettered with Gamble's name. Key personnel were given business cards, and a public relations and advertising consultant was retained. Through Mr. Friedman's efforts, L. T. Bannes was named Young Engineer of the Year, and a feature newspaper story was written about him, in which *133 Gamble was very favorably discussed. Architects, clients, prospective clients, and key employees were entertained at sporting events, dinners, and various clubs. Certain employees were encouraged to entertain persons who could help Gamble, and they were provided charge accounts for this purpose. Ground-breaking ceremonies with amenities such as personalized hard hats and little gold or silver shovels for the principals were instituted for publicity purposes. Each Christmas, a huge red ribbon was placed around the narrow neck of a planetarium which Gamble had constructed. Finally, to make Gamble more responsive to community needs, a program of charitable contributions was established. A new bookkeeping system was instituted. A bookkeeping machine and small computer were installed to help with the payroll and to keep track of the exact cost of a project as the job progressed. Gamble began to purchase its materials and supplies by accepting competitive bids. In addition, Mr. Schwartz attended various construction auctions in an effort to obtain material and supplies at reasonable prices. Mr. Friedman and Mr. Schwartz also decided to procure more negotiated and bid contracts. *134 During the years in issue, Mr. Friedman examined Dodge Reports (daily summaries of prospective construction work) generally on a daily basis. When he saw a job suited to Gamble, either he or Mr. Schwartz made the initial contact with the construction customer. In addition, Mr. Friedman ascertained whether the contract was to be a negotiated or competitively bid contract, and whether the company had a bid list if the contract was to be competitively bid. Through the efforts of Mr. Friedman and Mr. Schwartz, Gamble was placed on the bid list of numerous prospective customers and thus was able to submit bids on jobs not otherwise available to it. In addition, they made use of their numerous contacts and acquaintances to have Gamble seriously considered for many negotiated contracts. By their efforts, Gamble was able to obtain the following contracts: Type of
Contract Customer
Contract
Date
Contract Price
Profit
First National
Bid
10/31/68
$ 1,207,774.15
$ 72,805.61
Bank
Pope's
Negotiated
11/15/68
185,584.13
10,844.49
Cafeteria
A. G. Edwards
Bid
11/21/68
1,719,950.02
101,570.31
& Sons
Century Realty
Negotiated
12/18/68
2,336,289.43
116,362.40
Washington
Bid
3/18/69
63,828.81
13,486.63
Univ.
Delment Corp.
Negotiated
7/8/69
779,509.49
70,319.83
General
Bid
7/15/69
48,767.90
11,992.85
American Life
Insurance Co.
Bernard
Negotiated
2/15/70
20,449.47
1,714.15
Nursing Home
Maritz, Inc.
Bid
2/23/70
2,957,535.00
149,926.00
St. Louis
Bid
5/4/70
4,264,177.00
536,226.00
County Water
Co.
St. Louis
Negotiated
12/14/70
1,312,154.00
82,563.00
Geriatrics
Home
Target
Bid
1/14/71
2,139,434.00
49,945.00
Stores
*135 Such contracts accounted for approximately 14 percent of Gamble's aggregate profit for 1969, approximately 82 percent for 1970, and approximately 84 percent for the following year. Finally, Mr. Schwartz and Mr. Friedman were successful in substantially increasing Gamble's volume of work. During the years in issue, not only was Gamble's bonding increased, but its completed contract billings also rose from $ 8,212,533 to $ 15,491,199. They also considered expanding Gamble's business by procuring a prefabricated concrete distributorship and by joining other general contractors in joint ventures to enable Gamble to participate in larger construction projects. Mr. Schwartz was also successful in obtaining an unsecured loan of up to $ 200,000 from a local bank for Gamble in 1971. Exclusive of entertaining and attending meetings, Mr. Friedman initially devoted 6 to 8 hours a day to Gamble. Eventually, however, Gamble only occupied 2 to 3 hours a day of his time. Mr. Schwartz initially devoted 4 to 5 hours a day to Gamble, but during 1970, he worked full time at Gamble, except that in the last 4 months of the year he did spend several hours each day attending to another business *136 interest of his. From 1967 through 1970, the total compensation paid by Gamble to officers, directors, and Investment under the management contract is summarized below: [2]
1967
1968
1969
1970
Burnett Schwartz
$ 28,483
Harvey A. Friedman $ 2,500
L. Malin
16,000
Pringle T. George
$ 38,950
$ 38,950
12,800
12,800
L. T. Bannes
14,816
15,964
19,446
19,232
S. R. Hughes
17,250
16,856
17,079
16,962
R. A. Flood
12,775
12,085
12,185
12,174
J. F.Shaughnessy
11,079
11,901
13,530
15,194
Investment
62,711
50,149
91,751
Total
$ 94,870
$ 158,467
$ 127,689
$ 212,596
On its tax returns for 1968, 1969, and 1970, Gamble deducted the management fees as ordinary and necessary expenses under section 162. Similarly, Gamble deducted the $ 2,500 director's fee paid Mr. Friedman in 1969 and the $ 28,483 salary paid Mr. Schwartz in 1970. In his notice of deficiency, the Commissionr disallowed the deduction of the management fees and the salary paid Mr. Schwartz because he determined that they exceeded a reasonable allowance for services actually rendered *137 and that the management fees were a sham. 3. Interest
On its tax return for 1970, Investment deducted $ 3,885.07 as interest allegedly paid to Mr. Schwartz's mother on a $ 25,000.00 note owing from Medigroup to her which Investment had assumed pursuant to its agreement with ISS.In his notice of deficiency, the Commissioner disallowed the deduction because Investment failed to establish the existence of a bona fide indebtedness. 4. Late Filing Addition
In the absence of valid extensions, Gamble's 1968 tax return was due March 15, 1969, and Investment's tax return for its taxable year ending January 31, 1969, was due April 15, 1969. In April 1969, Investment applied for and received an automatic 90-day extension to file its 1969 corporate income tax return. Such extension was effective until July 15, 1969. On July 8, 1969, Investment applied for and received another extension to October 15, 1969. On both applications, Investment indicated that a consolidated return would be filed and listed Gamble as a member of the affiliated group. Both petitioners normally filed their Federal income tax returns with the same office of the Internal Revenue Service. On June 16, 1969, Gamble *138 received a notice from the Commissioner that its 1968 return had not been received. Gamble advised the district director in writing that its return would be filed as part of Investment's consolidated return and that Investment had been granted extensions. Subsequently, however, the petitioners were advised by their certified public accountants not to file consolidated returns, and they followed such advice. The parties agree that Investment has no tax liability for 1969 if it is not a personal holding company. Gamble filed its Federal corporate tax return for 1968 on January 14, 1970, and Investment filed its return for its 1969 taxable year on June 9, 1970. In his notices of deficiency to Investment and Gamble, the Commissioner imposed an addition to tax of 25 percent under section 6651(a) against each of them for the late filings. OPINION Issue 1. Loan - Dividend
The first issue for decision is whether the transfers of funds from Gamble to Investment were loans or dividends. If the transfers were dividends, Investment was subject to the personal holding company tax, but if the transfers were loans, Investment was not subject to such tax. Secs. 541 and 543. *139 Resolution of the loan - dividend issue turns on whether the petitioners intended to create a bona fide indebtedness which Investment intended to repay and Gamble intended to collect. Chism's Estate v. Commissioner,322 F. 2d 956, 960 (9th Cir. 1963), affg. a Memorandum Opinion of this Court; Electric & Neon, Inc. Inc. v. Commissioner,56 T.C. 1324, 1338-1339(1971), affd. without opinion 496 F. 2d 876 (5th Cir. 1974); Haber v. Commissioner,52 T.C. 255, 266 (1969), affd. per curiam 422 F. 2d 198 (5th Cir. 1970); Roschuni v. Commissioner,29 T.C. 1193, 1201-1202 (1958), affd. per curiam 271 F. 2d 267 (5th Cir. 1959), cert. denied 362 U.S. 988 (1960). Many objective indicia have been relied on by the courts in making such determination, including whether a note was executed ( Bayou Verret Land Co. v. Commissioner,450 F. 2d 850, 857 (5th Cir. 1971), affg. on this issue 52 T.C. 971 (1969)); whether interest was paid ( Clark v. Commissioner,266 F. 2d 698, 711 (9th Cir. 1959), affg. on this issue a Memorandum Opinion of *140 this Court); whether the obligation was secured ( Spheeris v. Commissioner,284 F. 2d 928, 931 (7th Cir. 1960), affg. a Memorandum Opinion of this Court, cert. denied 366 U.S. 944 (1961)); whethe part of the obligation was repaid ( Tollefsen v. Commissioner,431 F. 2d 511, 513 (2d Cir. 1970), affg. 52 T.C. 671 (1969), cert. denied 401 U.S. 908 (1971)); whether the borrower had the ability to repay ( Roschuni v. Commissioner,29 T.C. at 1203); whether the parties treated the transactions as loans on the corporate books and records ( Wentworth v. Commissioner,244 F. 2d 874, 875 (9th Cir. 1957), affg. 25 T.C. 1210 (1956)); and whether there was a specific business purpose for making the loan ( Joseph Lupowitz Sons, Inc. v. Commissioner,497 F. 2d 862, 869 (3d Cir. 1974), affg. on this issue a Memorandum Opinion of this Court). However, it must be kept in mind that the presence or absence of any of these or other indicia is not determinative; they are just helpful guideposts for the trier of fact who must determine, based on all of the surrounding *141 facts and circumstances, the crucial factual issue of whether repayment was actually intended. Alterman Foods, Inc. v. United States,505 F. 2d 873, 875-876 (5th Cir. 1974); Berthold v. Commissioner,404 F. 2d 119, 121 (6th Cir. 1968), affg. a Memorandum Opinion of this Court; Chism's Estate v. Commissioner,supra at 960; Shaken v. Commissioner,21 T.C. 785, 792 (1954). Here, the issue is a close one. On the one hand, there are several factors which point to a dividend. For example, there was no fixed date for repayment of the amount withdrawn from Gamble by Investment, nor was there a repayment schedule; no security was given for the advances, and no interest was charged or paid; the notes were not given contemporaneously with the transfer of funds; during the years in issue and for many years prior to that, Gamble paid no dividends; the net amount of the indebtedness increased during the years in issue; and when Gamble needed funds in 1975, Investment did not repay the indebtedness. On the other hand, several factors indicate the transfers were loans. The parties executed demand notes; they uniformly treated *142 the transfers on their financial statements and on their books and records as loans; both Mr. Schwartz and Mr. Friedman testified they intended Investment to repay the advances; and there was a specific business purpose for the loans, which in effect placed a ceiling on the amount that Investment needed to borrow. In addition, Gamble did not pay dividends because it needed to maintain its assets if it was to receive bonding from Travelers, and Investment did not come forward with any repayment in 1975 when Gamble experienced financial difficulty because it was required under its indemnity agreement with Travelers to hypothecate its major asset, its ISS stock. However, there are three additional factors which, in our judgment, tip the balance toward the bona fide indebtedness conclusion.
First, Investment made substantial repayments of the loan. In addition to the cash payments of $ 26,500, Investment repaid in excess of $ 200,000 of the liability through the management fees. Moreover, at the time Investment was performing its substantial services under the management contract, which was contemporaneous with the loans, it was contemplated that the fee accrued would be used to offset *143 the outstanding indebtedness. If the transfers are treated as dividends, then there was no arrangement for paying for the substantial management services furnished to Gamble under the management contract. Second, based on the evidence, we are satisfied that Investment had the ability to repay the loans. One source of repayment was the fees earned under the management contract. Another source was Investment's ISS stock. The parties have argued vigorously about the value of such stock based on their conflicting valuations of Medigroup, certain long-term leases, and a real estate option. Investment argued that its ISS stock was worth about $ 900,000, and the Commissioner estimated that its value was in excess of $ 200,000. Without deciding the actual fair market value, we believe the evidence would support a value somewhere in between those two extremes, and such value represents a significant source of repayment. In addition, Investment owned the Gamble stock, which also represented a significant source of funds to repay the loans. Finally, we are impressed with Mr. Gabel's opinion that Investment intended to repay the loans and that Gamble intended to collect them. He had *144 extensive dealings with Mr. Friedman and Mr. Schwartz around the time the loans were made, and he was convinced that the transfers were loans which would be repaid. On that basis, he and Travelers continued to provide bonding for Gamble's projects. Though Mr. Gabel's opinion may have been influenced by an interest in writing the increased bonding for Gamble, he also had a substantial interest in assuring the financial reliability of Gamble, and he had extensive contemporaneous understanding of its operations.For those reasons, we have concluded that his opinion merits special weight in reaching our conclusion. After carefully considering and weighing all of the evidence, we conclude that the transfers from Gamble to Investment were loans. Accordingly, Investment is not liable for the personal holding company tax. Issue 2. Reasonable Compensation
The deductibility of the management fees, and the 1970 salary of Mr. Schwartz paid by Gamble, turns on the meaning of section 162(a)(1), which permits a taxpayer to deduct "a reasonable allowance for salaries or other compensation for personal services actually rendered." To be deductible, it must be established that the payments: *145 (1) Were actually intended to be paid purely for the services, and (2) did not exceed the reasonable compensation for the services actually rendered. Sec. 1.162-7, Income Tax Regs.; Electric & Neon, Inc. v. Commissioner,56 T.C. 1324, 1340 (1971), affd. without opinion 496 F. 2d 876 (5th Cir. 1974); Nor-Cal Adjustors v. Commisioner,503 F. 2d 359, 362 (9th Cir. 1974), affg. a Memorandum Opinion of this Court; Klamath Medical Service Bureau v. Commissioner,29 T.C. 339, 347 (1957), affd. 261 F. 2d 842 (9th Cir. 1958), cert. denied 359 U.S. 966 (1959). Whether the petitioners intended the payments to be compensation for services presents a question of fact, to be resolved on the basis of all the surrounding facts and circumstances. Paula Construction Co. v. Commissioner,58 T.C. 1055, 1059 (1972), affd. without opinion 474 F. 2d 1345 (5th Cir. 1973); Electric & Neon, Inc. v. Commissioner,supra.Similarly, the reasonableness of the amount of the compensation presents a factual issue. Charles Schneider & Co. v. Commibsioner,500 F. 2d 148, 151 (8th Cir. 1974), *146 affg. a Memorandum Opinion of this Court, cert. denied 420 U.S. 908 (1975); Pacific Grains, Inc. v. Commissioner,399 F. 2d 603, 605 (9th Cir. 1968), affg. a Memorandum Opinion of this Court; Levenson & Klein, Inc. v. Commissioner,67 T.C. 694, 711 (1977); Pepsi-Cola Bottling Co. of Salina v. Commissioner,61 T.C. 564, 567 (1974), affd. 528 F. 2d 176 (10th Cir. 1975). The factors generally considered relevant in determining the reasonableness of compensation include: the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years.* * * [Mayson Mfg. Co. v. Commissioner,178 F. 2d 115, 119 (6th Cir. 1949), *147 revg. a Memorandum Opinion of this Court.] Commercial Iron Works v. Commissioner,166 F. 2d 221, 224 (5th Cir. 1948), affg. a Memorandum Opinion of this Court; Pepsi-Cola Bottling Co. of Salina v. Commissioner,61 T.C. at 567-568; Dahlem Foundation, Inc. v. Commissioner,54 T.C. 1566, 1579 (1970). No single factor is decisive; rather, we must consider and weigh the totality of the facts and circumstances in arriving at our decision. Mayson Mfg. Co. v. Commissioner,supra.As to the deductibility of the management fees and Mr. Schwartz's salary, Gamble bears the burden of proof ( Botany Worsted Mills v. United Sttates,278 U.S. 282, 292 (1929); Paula Construction Co. v. Commissioner,58 T.C. at 1058; Electric & Neon, Inc. v. Commissioner,56 T.C. at 1340), and on the basis of this record, it has carried such burden as to the management fees. The evidence clearly establishes that the management fees were intended to be compensation for services. The management contract was entered into only after the boards of directors of both Gamble and Investment resolved *148 to authorize such action. The resolutions plainly outlined the scope of the services contemplated by the management contract and the compensation to be paid for such services. Investment, through the efforts of Mr. Friedman and Mr. Schwartz, promptly undertook to perform those services during the years in issue. Both Mr. Friedman and Mr. Schwartz testified their services were performed pursuant to the management contract and that the management fees were paid on account of the services performed. Against all of this uncontroverted evidence, the Commissioner argues that certain "undisputed facts" prove that the management fees were never intended as compensation for services. However, most of these alleged undisputed facts are either not supported by the evidence or are disproved by it. The Commissioner contended that "The formula by which the management fees here in dispute were computed also eliminates all after-tax profit," but the evidence shows that the formula did not have such effect. He pointed to the fact that there was no similar management contract with Medigroup, but the evidence shows that there was no need for any such arrangement. He also maintained that the *149 management contract was executed to provide Investment with needed cash. Although Investment did need cash to fulfill its obligations under the 1968 agreement, such cash was supplied by the loans from Gamble. The management contract did provide a means for paying off those loans from Gamble, but that fact, without more, is insufficient to prove that the management fees were not intended as compensation for services actually rendered. The fact remains that the petitioner came forward with persuasive evidence to establish the requisite intent, that the Commissioner did not successfully impeach or controvert such testimony, and that the Commissioner presented no evidence whatsoever which would permit us to reach the opposite conclusion. Accordingly, on the basis of the evidence presented, we conclude that the management fees were intended purely as compensation for services. We think the evidence also overwhelmingly demonstrates the reasonableness of the compensation paid Investment for services performed under the management contract. Mr. Friedman and Mr. Schwartz brought impressive credentials and valuable and diversified business experience to Gamble, all of which we have described *150 in some detail in our Findings of Fact. They had wide acquaintances in the business world, and they had successfully managed other substantial businesses. Relying on their wealth of business experience, Mr. Friedman and Mr. Schwartz aggressively performed their duties under the management contract, determined to make Gamble into a large and successful construction firm. Almost immediately, they instituted a study to determine the strengths and weaknesses of Gamble, and upon completing such study, they took the steps they deemed necessary to correct the weaknesses. In our Findings of Fact, we have set forth the many changes which they made in the personnel and administrative practices of Gamble. Most importantly, they used their numerous contacts and acquaintances in the community to help Gamble to get on the bid lists of many of the more regular builders in the area and to enable Gamble to be seriously considered for many negotiated contracts. By their efforts, Gamble was able to secure four contracts in 1968, three contracts in 1969, four contracts in 1970, and one contract in 1971, and these contracts accounted for approximately 14 percent of Gamble's profit in 1969, approximately *151 82 percent in 1970, and approximately 84 percent in the 13-month period ending January 31, 1972. Under their management, Gamble's completed contract billing increased from around $ 8 million in 1968 to in excess of $ 15 million by January 31, 1972. The services performed by Mr. Schwartz and Mr. Friedman under the management contract consumed substantial portions of their time. For their time and effort, Investment received about $ 62,000 in 1968, about $ 50,000 in 1969, and about $ 91,000 in 1970. Based on this record, we cannot say such compensation was unreasonable, and accordingly, we hold that the management fees are deductible by Gabmel. As to the salary paid Mr. Schwartz in 1970, we reach a different conclusion. Irrespective of whether the salary was intended as compensation, Gamble has not proved that any part of the salary was reasonable compensation for services actually rendered. The evidence simply does not establish that Mr. Schwartz performed services for Gambmel which were independent of and different from those required of him under the management contract. To the contrary, the evidence tends to establish that Mr. Schwartz and Investment were both compensated *152 for the same services performed by Mr. Schwartz. Accordingly, we hold that Gamble is not entitled to a deduction for the salary it paid Mr. Schwartz in 1970 because such salary was not reasonable compensation for services actually rendered by Mr. Schwartz in his capacity as a Gamble employee. Issue 3. Interest Deduction
The next issue for decision is whether Investment is entitled to an interest deduction under section 163(a), which allows a deduction for "interest paid or accrued within the taxable year on indebtedness." Interest is defined as compensation for the use or forbearance of money. Deputy v. Dupont,308 U.S. 488 (1940); Golsen v. Commissioner,54 T.C. 742, 753 (1970), affd. 445 F. 2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971); Williams v. Commissioner,47 T.C. 689, 692 (1967), affd. 409 F. 2d 1361 (6th Cir. 1968), cert. denied 394 U.S. 997 (1969); Cooper Agency v. Commissioner,33 T.C. 709, 715 (1960), affd. per curiam sub nom. Cooper's Estate v. Commissioner,291 F. 2d 831 (4th Cir. 1961). Indebtedness is defined *153 as an unconditional and legally enforceable obligation for the payment of money. Autenreith v. Commissioner,115 F. 2d 856, 858 (3d Cir. 1940), affg. 41 B.T.A. 319 (1940); Kovtun v. Commissioner,54 T.C. 331, 338 (1970), affd. per curiam 448 F. 2d 1268 (9th Cir. 1971), cert. denied 405 U.S. 1016 (1972). In addition, to be entitled to the deduction, it must be established that the interest payments were on account of an indebtedness owed by the taxpayer. Enoch v. Commissioner,57 T.C. 781, 794 (1972); Sheppard v. Commissioner,37 B.T.A. 279, 281-282 (1938); Sulzberger v. Commissioner,33 B.T.A. 1093, 1099 (1936). Investment bears the burden of proving it is entitled to the deduction ( Woodward v. United States,208 F. 2d 893, 897 (8th Cir. 1953); Rule 142, Tex Court Rules of Practice and Procedure), and it has failed to meet its burden. The only evidence presented by Investment was the testimony of Mr. Schwartz that Medigroup allegedly borrowed $ 25,000 from his mother, that ISS and Investment agreed that Investment would assume such obligation, *154 and that the assumption agreement was lost. Investment argues under Demkowicz v. Commissioner,551 F. 2d 929, 931-932 (3d Cir. 1977), revg. a Memorandum Opinion of this Court, that the uncontroverted and uncontradicted testimony of a taxpayer sufficient to make out a prima facie case for the deduction must be accepted by this Court in the absence of a finding that the testimony should be rejected as being "improbable, unreasonable or questionable." We accept Mr. Schwartz's testimony insofar as it goes, but the evidence does not establish how the obligation to pay the alleged interest became an enforceable obligation of Investment through an agreement between ISS and Investment to which Medigroup was not a party. Thus, Investment completely failed to establish how it became obligated to pay such interest and that it was in fact required to do so. Accordingly, we hold that Investment is not entitled to deduct such interest. Issue 4. Late Filing Addition
The last issue for decision is whether Investment and Gamble are liable for the late filing additions imposed by the Commissioner under section 6651(a). Since the parties have agreed that Investment has *155 no tax liability for 1969 unless it is liable for the personal holding company tax, and since we have concluded Investment is not liable for such tax, it also is not liable for the late filing addition. The Commissioner argues that under section 6651(a), Gamble's return for 1968 was more than 5 months late and that there was no reasonable cause for the late filing. Gamble argues that section 6081 and the regulations thereunder authorized Investment to obtain an extension for the group where a consolidated return was contemplated, that because of the extensions, such return was not due until October 15, 1969, and that the maximum addition is 15 percent since Gamble's return was filed on January 14, 1970, less than 3 months after it was due. We think both parties have overstated their positions. When a taxpayer fails to file its tax return without any reasonable cause, section 6651(a) authorizes the Commissioner to impose an addition to tax of 5 percent for every month it is late up to a maximum addition of 25 percent. Section 1502 authorizes the Secretary to adopt regulations dealing with affiliated groups which file consolidated returns, and pursuant to such authority, section *156 1.1502-76, Income Tax Regs., was adopted. Under section 1.1502-76(a)(1), it is generally provided that a consolidated return of a group must be filed on the basis of the parent's taxable year, and that each subsidiary must adopt the parent's annual accounting period for the first consolidated return year for which the subsidiary's income is includable in the consolidated return. Section 1.1502-76(b) describes the income to be included in such consolidated return. Generally, the consolidated return must include the income of the parent for the parent's entire taxable year, as well as the income of each subsidiary for the portion o the parent's taxable year during which the subsidiary was a member of the group. Sec. 1.1502-76(b)(1). As to the period during which the subsidiary was not a member of the group, the regulations require the subsidiary to file a separate return reporting its income for such period. Sec. 1.1502-76(b)(2) and (3). The regulations also set forth how the income is to be allocated between the separate and consolidated returns. Sec. 1.1502-76(b)(4). Section 1.1502-76(c) generally prescribes the due date for a separate return for periods not included in *157 a consolidated return. If the group filed a consolidated return on or before the due date for the filing of the subsidiary's separate return, then the separate return must be filed no later than the due date of the consolidated return. Sec. 1.1502-76(c)(1). Section 1.1502-76(c)(2) provides: (2) Consolidated return not filed by due date for separate return. If the group has not filed a consolidated return on or before the due date for the filing of a subsidiary corporation's separate return (including extensions of time and determined without regard to any change of its taxable year required under paragraph (a) of this section), then on or before such due date such subsidiary shall file a separate return either for the portion of its taxable year for which its income would not be included in a consolidated return if such a return were filed, or for its complete taxable year. However, if a separate return is filed for such portion of its taxable year and the group subsequently does not file a consolidated return, such subsidiary corporation shall file a substituted return for its complete taxable year not later than the due date (including extensions of time) prescribed for the filing *158 of the common parent's return. * * * In addition, section 1.6081-3(b), Income Tax Regs., provides in part: (b) Consolidated returns. An application for an automatic extension of time for filing a consolidated return shall be made by a person authorized by the parent corporation to request such extension. * * * There shall be attached to such application a statement listing the name and address of each member of the affiliated group for which such consolidated return will be made. * * * Upon the timely filing of Form 7004 with the internal revenue officer with which such corporation files its return, the 3-month extension shall be considered as granted to the affiliated group for the filing of its consolidated return or for the filing of each member's separate return.* * * Finally, section 1.1502-76(d), Income Tax Regs., says that any period which is less than 12 months and which requires the filing of a separate or consolidated return shall be considered as a separate taxable year. Under such regulations, it is clear that on or before March 15, 1969, Gamble was required to file a separate return for the period January 1, 1968 to August 14, 1968, reporting its income for *159 such period. It is equally clear under such regulations that the reference to a separate return in section 1.6081-3(b) refers only to a separate return for the period for which a consolidated return could have been filed; therefore, since Gamble did not receive any extensions with respect to its separate return for the period ending August 14, 1968, and since such return was more than 5 months late, the 25-percent late filing addition was properly imposed as to any deficiency attributable to such period. As to the period August 14, 1968 to December 31, 1968, a consolidated return could have been filed by Investment and Gamble, including the income of Gamble for such period, and Investment's requests for the extension of time to file such consolidated return were effective and extended the due date for a consolidated or separate return for such period to October 15, 1969, even though a consolidated return was not in fact filed. Accordingly, since the return for such period was filed within 3 months after such date, the addition to tax attributable to any deficiency for such period is limited to 15 percent. In the Rule 155 computation, the parties will be expected to allocate Gamble's *160 1968 income according to the provisions of section 1.1502-76(b)(4). Decisions will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.↩
2. In some of the figures, the cents have been omitted.↩